COMMONWEALTH vs. CARROLL K. ST. GERMAIN.

Middlesex. April 9, 1980. — August 5, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Practice, Criminal,* Disclosure of statements by witness, Mistrial, Note-taking by jurors, Opening statement by prosecutor. *Jury and Jurors. Evidence,* Motive.

At a criminal trial, the judge did not err in denying the defendant's motion for a mistrial based on the delayed disclosure of one of the pretrial statements of the chief prosecution witness since earlier disclosure of the statement would not have created a reasonable doubt that would not otherwise have existed. [261-265]

At a criminal trial, the judge did not err in permitting the jurors, pursuant to Rule 8A of the Superior Court (1974), as amended, to take notes throughout the presentation of evidence, the opening and closing arguments of counsel, and the judge's charge. [265-270]

At a murder trial, the judge did not err in admitting evidence of a prior encounter between the defendant and the victim which suggested a motive for the crime or in permitting the prosecutor to refer to that evidence in his opening statement. [270-271]

INDICTMENTS found and returned in the Superior Court on September 15, 1977.

The cases were tried before *Morse,* J.

*John C. McBride* for the defendant.

*Pamela L. Hunt,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. On December 28, 1976, William Herbits, eighty-four, and his wife Julia, seventy-two, were viciously[1]

---

[1] The brutality of the killings was not disputed. The bodies were discovered by the Herbits' daughter and grandson on the day of the crimes. William Herbits died as a result of gunshot wound to the face, a penetrating stab wound in the neck and a blunt force injury to the head. Evidence indicated the bullet wound, the stab wound, and the injury to his head, were all inflicted while Herbits was still alive. Julia Herbits had been

slain at their home in Newton. After trial by jury, Carroll K. St. Germain was convicted on two counts of murder in the first degree, one count of armed assault in a dwelling house, and two counts of assault and battery by means of a dangerous weapon.[2] The defendant now appeals. G. L. c. 278, §§ 33A-33G.

St. Germain argues that the judge (1) improperly denied his motion for a mistrial based on the delayed disclosure of one of the pretrial statements of the chief government witness; (2) erred in allowing jurors to take notes during the trial; and (3) abused his discretion both in admitting certain evidence of motive and in permitting the prosecutor to mention this evidence in his opening. We find neither error nor any basis for an exercise of our power under G. L. c. 278, § 33E, and therefore affirm the convictions.

At trial, the chief witness against St. Germain was one Kevin LaMier, a former employee of the defendant at Ashmont Lumber and Supply, Inc.[3] LaMier lived near the lumber company, and began working there in July, 1976. LaMier, who turned sixteen in November, 1976, worked full time during the summer and part time after the start of school.

On December 28, 1976, LaMier testified, he was awakened by a neighborhood youth, and told to report for

---

shot twice in the head at point blank range. Her ear was cut in half. An eyeball and her throat were also slashed, and her head was smashed. A forty to fifty pound statue found near Julia Herbits' head had blood of her type on it.

[2] On the murder convictions, the defendant was sentenced to consecutive terms of life imprisonment at the Massachusetts Correctional Institution at Walpole. Additionally, the defendant was sentenced to a term of life for armed assault in a dwelling house, this sentence to be served concurrently with the first sentence of life imprisonment for murder. Finally, the defendant was sentenced to terms of not less than nine nor more than ten years on the two convictions for assault and battery by means of a dangerous weapon, such sentences also to be served concurrently with the first sentence for murder.

[3] Without LaMier, the Commonwealth could not have convicted St. Germain.

work at Ashmont Lumber.[4]  LaMier walked to the com-
pany's office and observed St. Germain talking on the tele-
phone.  Shortly thereafter, St. Germain picked up a clip-
board, locked the door, and directed LaMier to a red pickup
truck which St. Germain regularly drove.

St. Germain told LaMier that they were going to collect a
bill, and after half an hour he stopped the truck in front of a
gray house at 249 Commonwealth Avenue, Newton.  St.
Germain handed LaMier an Ashmont Lumber and Supply
bill which had the name Herbits on it as well as a descrip-
tion of some lumber.  LaMier was told to "go up and collect
the money."  St. Germain added, according to LaMier, that
he would collect the bill himself but the Herbitses would not
let him into their home.

LaMier took the bill and went to the front door of the
house.  He rang the bell and, after a brief conversation with
the elderly woman who answered the door, handed her the
bill.  After LaMier was invited inside, the man in the house
told LaMier that the couple did not owe the money.  The
property on which the work had been performed had been
sold either three weeks or three months earlier.  The man
asked to keep the bill, and LaMier assented.  LaMier then
left.  LaMier returned to the truck and told St. Germain
what had been said.  St. Germain said, "Bastards.  The
fucking Jewish bastards have all the money in the world and
they don't want to pay."  The two then drove away.

After driving for fifteen or twenty minutes, St. Germain
parked the truck and went into a bar.  LaMier remained in
the truck.  According to LaMier, after an hour or an hour
and a half, St. Germain returned to the truck.  The two
drove for a short while and then stopped for lunch.  After
lunch, St. Germain told LaMier he wanted LaMier to go
back to the Herbits house and deliver a second bill.  After
driving to the house, St. Germain took a bill out of his
pocket and handed it to LaMier.  LaMier went up to the

---

[4] A young neighbor of LaMier testified that St. Germain told him to
wake LaMier up and tell LaMier to report to work.

house, rang the bell, and, when Mrs. Herbits answered the door, he handed her the second bill. Suddenly, St. Germain brushed by LaMier, pushed the front door open and grabbed Julia Herbits by the neck with his right hand. LaMier saw a small gun in St. Germain's left hand. He then heard St. Germain ask, "Where is the old man?" He saw St. Germain push Julia Herbits so hard that she fell to the floor. He saw St. Germain put the gun to William Herbits' face and say "Get the fuck on the floor." St. Germain ordered LaMier to "stand over" Herbits. According to LaMier, William Herbits said, "Don't hurt my wife. Let her go, and she will get you the money." St. Germain replied, "You'll fucking pay now, won't you."

St. Germain told LaMier to move the pickup truck farther down the street and LaMier left the house. After moving the truck and waiting for five or ten minutes, LaMier went back to the house. He looked through the window next to the front door and saw that William Herbits' hands were tied. St. Germain was kneeling over Julia Herbits. LaMier could see that her feet were tied. LaMier went back to the truck and waited for St. Germain. Fifteen minutes later St. Germain came out of the house, then turned around and went back in the house for another ten minutes. St. Germain came out of the house again and started toward the pickup truck. As St. Germain reached the end of the Herbitses' walkway he turned around, walked back to the house and put his hand through a window to the right of the front door.

When St. Germain returned to the truck, he was out of breath. He said, "That's what some people need is a good smack in the head to make them pay what they owe." LaMier saw blood on St. Germain's shirt, gloves, and wrists. On returning to Ashmont Lumber St. Germain went inside. LaMier followed after stopping briefly to talk with a friend. St. Germain gave LaMier $30. LaMier noticed St. Germain had changed his shirt and was washing his hands.

LaMier then left the lumber company and arrived home about 3 P.M. His mother testified that when LaMier re-

turned home he did not act as he usually did and that he appeared nervous and upset.  After the six o'clock news reported the slayings, LaMier talked with his mother about the Herbitses' deaths,  As he spoke with his mother, LaMier began to cry and then went to his room.

That night LaMier talked with his parents.  Two or three days later he went back to work after being called by another employee of St. Germain.  LaMier worked for St. Germain until August 10, 1977, when the defendant requested LaMier help him with work at the edge of a roof. When LaMier saw the defendant send the other workers to another area, he became fearful and therefore went home. LaMier viewed this incident as a threat, and two days later he went to the police.

Various details of LaMier's testimony concerning events other than those transpiring at the Herbits home were confirmed by other witnesses.  In addition, the Commonwealth offered evidence that approximately two weeks before the crimes St. Germain had asked one of his employees if the employee wanted to go on a "hit" with St. Germain to a house in Newton where an old man in his eighties lived with an old lady in her seventies.  The employee asked St. Germain how he planned to subdue the elderly couple.  St. Germain said he was "going to kill them."  The employee declined to go on the "hit" because he wasn't "into murder." St. Germain replied, "Well, someone else will take it if you don't."  The employee saw the defendant take a small gun from his left pocket and say, "1, 2, 3, Bang, bang."

Cross-examination brought out inconsistencies in LaMier's direct testimony and inconsistencies between LaMier's direct testimony and his testimony before the grand jury and at a probable cause hearing.  The cross-examination was thorough, searching and fully explored all the weaknesses in LaMier's testimony.  The defense offered witnesses who claimed to have seen St. Germain at various times on December 28, as well as a witness who said that due to an incident at work, LaMier had threatened to get even with St. Germain.  Several witnesses impeached LaMier's de-

scription of the pickup truck, and an expert said that the bill from Ashmont Lumber found in the Herbits home was not in the defendant's handwriting.

*Delayed disclosure of exculpatory evidence.* On the eighth day of trial, during the cross-examination of LaMier, the Commonwealth voluntarily disclosed the existence of a tape recorded interview of LaMier conducted by Newton police eleven months prior to trial.[5]

St. Germain claims that the tape recording represents "exculpatory" evidence,[6] "material" to the defense,[7] which was "suppressed" by the Commonwealth,[8] and whose delayed disclosure so prejudiced the defendant's right to a fair trial that the judge was required to grant a mistrial, and we, therefore, are obligated to reverse his convictions. We disagree.

---

[5] St. Germain properly does not argue that this interview fell within the scope of pretrial discovery orders. The defendant's motion for copies of statements of witnesses was allowed only as to "copies of all statements . . . later reduced to writing," and the tape recording of the interview was never transcribed prior to trial. The judge, furthermore, found that since the assistant district attorney had no knowledge of the tape recording prior to disclosing it, it could not be argued that the prosecutor had deliberately failed to reduce the recording to writing so as to avoid discovery. Cf. *Commonwealth* v. *Gilbert,* 377 Mass. 887, 892-893 (1979).

[6] "[E]xculpatory" in this context is not a narrow term connoting "alibi or other complete proof of innocence," *Commonwealth* v. *Ellison,* 376 Mass. 1, 22 n.9 (1978), but rather comprehends all evidence "which tends to 'negate the guilt of the accused' . . . or, stated affirmatively, 'supporting the innocence of the defendant.'" *Commonwealth* v. *Pisa,* 372 Mass. 590, 595, cert. denied, 434 U.S. 869 (1977).

[7] Evidence is material in the constitutional sense if, on consideration of the entire record, the evidence is capable of creating a reasonable doubt that would not otherwise exist. *Commonwealth* v. *Wilson,* ante 90, 107 (1980). See generally *United States* v. *Agurs,* 427 U.S. 97 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 87 (1963).

[8] The Commonwealth does not argue that the fact that the prosecutor himself was unaware of the existence of the tape recordings excuses the Commonwealth's delay in disclosure. "The prosecutor's office is . . . the spokesman for the Government." *Giglio* v. *United States,* 405 U.S. 150, 154 (1972). "The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure." *Barbee* v. *Warden, Maryland Penitentiary,* 331 F.2d

Even if we were to assume that the interview became material in the constitutional sense [9] prior to the time its existence was disclosed by the Commonwealth [10] it would not

842, 846 (4th Cir. 1964). "The prosecuting attorney's obligations . . . extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office." A.B.A. Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 2.1(d) (Approved Draft 1970). "To the extent this [requirement] places a burden on . . . prosecution offices, procedures and regulations can be established to carry that burden and to insure communications of all relevant information on each case to every lawyer who deals with it." *Giglio* v. *United States, supra.*

[9] See note 7, *supra.* After trial, St. Germain filed a motion for a new trial grounded on the same arguments now advanced to challenge the judge's denial of the defendant's motion for a mistrial. St. Germain does not appeal from the denial of this motion for a new trial, but we have considered the appropriateness of the judge's denial in view of our responsibilities under G. L. c. 278, § 33E. The judge made careful findings, and concluded that in view of the case as a whole, the discrepancies between LaMier's testimony and the tape recording were insufficient to make the recording constitutionally material. "We attach considerable importance to this opinion of 'one having first-hand knowledge'" of the cases. *Commonwealth* v. *Wilson, ante* 90, 112 n.44 (1980), quoting from *Commonwealth* v. *Medina,* 380 Mass. 565, 576 (1980). For this reason as well as for the additional reasons set out, *infra,* for upholding the judge's denial of St. Germain's motion for a mistrial, we find no error in the denial of his motion for a new trial.

[10] The Commonwealth argues that since the only exculpatory value claimed for the tape recording is the impeachment value of certain discrepancies between LaMier's recorded statement and his testimony at trial, the recording could not have become exculpatory at all until LaMier testified. The Commonwealth, however, must be assumed to have been familiar before trial with the anticipated testimony of its key witness, and there is no indication in the record before us that any of the "discrepancies" St. Germain points to in LaMier's testimony came as a surprise to the prosecution. In the case of a witness as important as LaMier, furthermore, the Commonwealth should anticipate that the defense will properly view even relatively minor discrepancies in prior statements as exculpatory. Moreover, prior inconsistent statements that would not be constitutionally material in the case of a minor or corroborating witness may well be material in the case of a witness as vital as LaMier. We reiterate that "prosecuting attorneys [should] become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it."

follow that the judge was therefore automatically required
to declare a mistrial. This is not a case where exculpatory
evidence has been suppressed until after trial. Compare
*Commonwealth* v. *Ellison*, 376 Mass. 1 (1978); *United
States* v. *Agurs*, 427 U.S. 97 (1976); *Brady* v. *Maryland*, 373
U.S. 83 (1963). "Where evidence meeting the constitu-
tional standards for materiality is initially suppressed, but
then disclosed, it is the consequences of the delay that mat-
ter, not the likely impact of the nondisclosed evidence, and
we ask whether the prosecution's disclosure was sufficiently
timely to allow the defendant 'to make effective use of the
evidence in preparing and presenting his case.'" *Common-
wealth* v. *Wilson*, *ante* 90, 114 (1980), quoting from *Com-
monwealth* v. *Adrey*, 376 Mass. 747, 775 (1978). Declara-
tion of a mistrial was therefore required only if, "given a
timely disclosure, the defense would have been able to pre-
pare and present its case in such a manner as to create a rea-
sonable doubt that would not otherwise have existed."
*Commonwealth* v. *Wilson*, *supra*. St. Germain argues that
the delayed disclosure of the existence of the tape recording
prevented him from effectively exploiting what are said to
be thirteen discrepancies between LaMier's testimony and
his recorded statement. The short and sufficient answer to
this argument is that, beyond advancing it, St. Germain of-
fers no indication of how he would have restructured his
cross-examination of LaMier or otherwise altered his prepa-
ration and presentation so as to take better advantage of the
alleged discrepancies.

In addition to being wholly speculative, St. Germain's
argument ignores the fact that he calculatedly chose not to
cross-examine LaMier on the basis of the interview. At the
time the Commonwealth disclosed the existence of the tape
recording, the judge suggested to defense counsel that he

Commentary to A.B.A Standards for Criminal Justice, Standards Relat-
ing to Discovery and Procedure Before Trial 2.1(d) (Approved Draft
1970). See *Commonwealth* v. *Wilson*, *ante* 90, 107 n.37 (1980). See
*United States ex rel. Annunziato* v. *Manson*, 425 F. Supp. 1272, 1280 (D.
Conn.), aff'd 566 F.2d 410 (1977).

listen to the tapes, but counsel chose not to do so. Two days later, after the tape recording had been transcribed, the judge granted a continuance for counsel to consider whether he would recall LaMier or the police officer who conducted the interview for further cross-examination, or call any of the other persons present at the interview. After having thus had ample opportunity to consider carefully his course of action,[11] defense counsel chose not to recall LaMier.[12]

Tactical considerations plainly supported a decision not to further cross-examine LaMier on the basis of the recorded interview. As the trial judge found, LaMier's "credibility had [already] been extensively challenged on the basis of his testimony at the probable cause hearing, his Grand Jury testimony, and other discrepancies, among them his failure to come to the police for nearly eight months." Nothing in the interview was completely devastating to LaMier's trial testimony, and most of the statement was consistent as to the important facts and did not modify the basic and vital parts of LaMier's total testimony.[13]

Furthermore, although LaMier was not recalled, the police officer who conducted the interview was. Through the testimony of this officer, St. Germain placed before the jury all but one[14] of the thirteen discrepancies he now claims

---

[11] The continuance, which extended over a weekend, afforded counsel three days to consider his trial strategy. In view of this continuance, the delayed disclosure cannot be said to have forced defense counsel to make "difficult tactical decisions quickly in the heat of trial." *Commonwealth v. Ellison*, 376 Mass. 1, 25 (1978).

[12] The defendant personally agreed to this strategy.

[13] In this situation a defense tactic of recalling LaMier to impeach him through the use of certain portions of the interview as prior inconsistent statements might have allowed the Commonwealth to introduce other portions of the interview as explanatory of LaMier's trial testimony. See *Commonwealth v. Zukoski*, 370 Mass. 23, 27 (1976). The consistent aspects of the interview, in contrast to the peripheral quality of the discrepancies, ran to the heart of LaMier's testimony. Thus viewed, the decision not to recall LaMier does not appear unwise.

[14] The single omission centered on LaMier's statement to police that St. Germain had told him in the bar where they ate lunch on the day of the crimes that "what some people need is a good smack in the head to make

exist between the recorded statement and LaMier's testimony. None of these discrepancies contradicted LaMier's essential testimony that St. Germain handed him the bills, entered the Herbits house and emerged with blood on his hands and shirt. Similarly, there was no omission from the statement of any of the central facts testified to by LaMier. Defense counsel also made extensive use of the statement during his summation. "In this situation, there is no justification for granting a new trial so that a different jury might hear the same evidence." *United States* v. *Kaplan,* 554 F.2d 577, 580 (3d Cir. 1977).

In sum, we can see no basis for the defendant's claim that earlier disclosure of the statement would have created a reasonable doubt that would not otherwise have existed, or "that the delayed receipt of the evidence 'affected the outcome of the trial.'" *Commonwealth* v. *Wilson, ante* 90, 115 (1980), quoting from *United States* v. *Agurs,* 427 U.S. 97, 104 (1976). See *Commonwealth* v. *Mains,* 374 Mass. 733, 736-738 (1978).

*Note-taking by jurors.* The judge, pursuant to Rule 8A of the Superior Court (1974), as amended,[15] permitted the jurors to take notes throughout the presentation of evidence, the opening[16] and closing arguments of counsel and the

---

them pay what they owe." At trial, LaMier also attributed this precise statement to St. Germain, but said it was made in the pickup truck after the murders were committed. Even if he had had a transcript of the recorded interview prior to trial, defense counsel might well have chosen not to risk both reemphasizing this damaging statement and suggesting an element of premeditation by attempting to discredit LaMier by arguing that he earlier said the statement was made before the murders were committed, not afterwards.

[15] Rule 8A of the Superior Court provides: "In any case where the court, in its discretion, permits jurors to make written notes concerning testimony and other evidence, the trial judge shall precede the announcement of permission to make notes with appropriate guidelines. Upon the recording of the verdict or verdicts, the notes of the jurors shall be destroyed by direction of the trial judge. Jurors may also be granted permission by the trial judge to make notes during summation by counsel and during the judge's instructions to the jury on the laws." Rule 8A became effective May 6, 1978, two months prior to trial.

[16] The judge interpreted the "summation by counsel" referred to in rule 8A as including opening statements as well as closing arguments. While

judge's charge. St. Germain argues that this note-taking constituted "prejudicial error" and deprived him of his "constitutional right to a fair trial." We disagree and hold, as a matter of Massachusetts practice,[17] that there was no error. The judge carefully explained that no juror was required to take notes, indicating that some persons "remember things more accurately by listening." The judge cautioned the jurors that they "should not attempt to make a complete transcript of the trial," and should keep any notes they might wish to take "brief" so as to be able to assess carefully each witness's credibility by observing the manner in which the witness testified.

Each juror's notes, the judge stressed, were to serve only as "the notes of the individual juror . . . because it is the collective memory of the jury that is going to control when it comes time to deliberate on the case." It would not be proper, the judge added, for "one juror [who] has more training in the taking of notes than the other[s]" to argue, "This is the testimony because it is in my notes."

While the validity of juror note taking initiated by a judge pursuant to Rule 8A of the Superior Court is a question of first impression before this court, we have had previous oc-

St. Germain does not suggest that rule 8A does not authorize note-taking during opening statements, it is possible that the rule was intended to be so read, serving, in effect, as a prophylactic against the jurors mistakenly treating as evidence, at the end of trial, material contained in their notes on an opening statement. Regardless of how the rule is construed, when the judge in this case told the jurors just prior to the Commonwealth's opening statement that they could take notes, he carefully emphasized that opening statements are not evidence, a point also made by the assistant district attorney and reemphasized once again by the judge immediately following the Commonwealth's opening. In these circumstances, even if the rule is read as not specifically authorizing note-taking during opening statements, we find no error.

[17] St. Germain cites no authority for his bald assertion that the juror note-taking at his trial constituted constitutional error, and we can find none, whether reference is had to the State or to the Federal Constitution. To the extent that the so called "rule" against juror note taking exists at all in other jurisdictions, it has consistently been viewed as a creation of the common law. See Note, Taking Note of Note-Taking, 10 Colum. J. of L. and Soc. Prob. 565, 574 (1974).

casion to consider the general issue of juror note-taking.[18] In *Commonwealth* v. *Tucker*, 189 Mass. 457 (1905), this court, although leaving open the question whether note-taking by a juror was a "commendable practice," declared that by "the great weight of authority [such note-taking] is not illegal, and as matter of law it does not require the setting aside of the verdict." *Id.* at 497. The question of note-taking was one properly "left to the discretion of the [trial] court." *Id.*[19]

The note-taking permitted under rule 8A and the judge's additional instructions, furthermore, also conforms to the "great weight" of current authority. In the Federal courts, note-taking is universally permitted in the discretion of the judge.[20] See Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 409, 424 (1960); E.J. Devitt & C.B. Blackmar, Federal Jury Practice and Instructions, § 5.08 (3d ed. 1977 & Supp. 1980).[21] Final-

---

[18] The practice of juror note-taking is not a new one in Massachusetts. Jurors here were apparently taking notes prior to the Declaration of Independence: the jury foreman in the *Boston Massacre* case, tried in Boston in 1770, took notes and was joined in doing so by at least one other juror. See H.B. Zobel, The Boston Massacre 271 (1970); L.K. Wroth & H.B. Zobel, eds., The Adams Papers, Vol. 3, Legal Papers of John Adams 25 n.89 (1965).

[19] The issue was raised but not decided in *Randolph* v. *O'Riordan*, 155 Mass. 331 (1892).

[20] *United States* v. *Johnson*, 584 F.2d 148, 157-158 (6th Cir. 1978), cert. denied, 440 U.S. 918 (1979). *United States* v. *MacLean*, 578 F.2d 64, 65-67 (3d Cir. 1978). *United States* v. *Anthony*, 565 F.2d 533, 536 (8th Cir. 1977), cert. denied, 434 U.S. 1079 (1978). *United States* v. *Riebold*, 557 F.2d 697, 705-706 (10th Cir.), cert. denied, 434 U.S. 860 (1977). *United States* v. *Bertolotti*, 529 F.2d 149, 159-160 (2d Cir. 1975). *United States* v. *Braverman*, 522 F.2d 218, 224 (7th Cir.), cert. denied, 423 U.S. 985 (1975). *United States* v. *Pollack*, 433 F.2d 967, 967-968 (5th Cir. 1970). *Toles* v. *United States*, 308 F.2d 590, 594 (9th Cir. 1962), cert. denied, 375 U.S. 836 (1963). *Goodloe* v. *United States*, 188 F.2d 621, 621-622 (D.C. Cir. 1950), cert. denied, 342 U.S. 819 (1951).

[21] The judge's additional instructions to the jurors in this case correspond in several respects to the following instructions suggested by these commentators:

"The court will permit jurors who desire to do so to take notes during the course of this trial, since there may be complicated issues in which the

ly, in the State courts the majority rule also permits note-taking by jurors as a matter of the judge's discretion. See generally Annot., 14 A.L.R.3d 831 (1967 & Supp. 1979). See also Uniform R. Crim. P. 513(e), 10 U.L.A. 266 (Master ed. 1974) ("If note taking by the jurors will likely assist them in their deliberations, the court may permit them to take notes under appropriate conditions and admonitions. The notes may be disclosed only to fellow jurors during deliberations").

St. Germain advances several arguments against the practice of juror note-taking: [22] (1) that "the best note taker

---

notes should be helpful. No juror, of course, is required to take notes, and some may feel that the taking of notes is not helpful because it may be a distraction and may interfere with one's hearing and evaluation of all of the evidence. If you do take notes please keep them in confidence between yourself and your fellow jurors.

"Notes are only an aid to memory and should not be given precedence over your independent recollection of the facts. A juror who does not take notes should rely on his or her independent recollection of the proceedings, and should not be influenced by the notes of other jurors. Nor should any of you who take notes let note taking distract you from the ongoing proceedings." E.J. Devitt & C.B. Blackmar, Federal Jury Practice and Instructions § 10.06 (Supp. 1980).

[22] Although St. Germain's arguments are briefed without citation, they represent a virtually verbatim recitation of the arguments considered (and rejected) by the American Bar Association Project on Minimum Standards for Criminal Justice. See A.B.A. Standards for Criminal Justice, Standards Relating to Trial by Jury, Comment to Standard 4.2 (Approved Draft 1968). The Project found each of these arguments to be largely without merit: "As to the argument that a juror armed with notes may dominate others, . . . certain jurors are likely to be more influential in any event. 32 J. Am. Jud. Soc'y 57 (1948). 'That conflicts of memory existed before notes were taken and, nevertheless, were reconciled in deliberation certainly is indicative that some means was utilized to influence the dissenter and thus achieve unanimity.' Note, 18 U. Pitt. L. Rev. 800, 809 (1957). Also . . . undue influence is unlikely today when the vast majority of jurors are literate, so that each juror might support his own position with his own notes. Id. at 811. As to the contention that the case might turn on an imperfectly written note . . . 'this argument begs the question' because the case might likewise turn on imperfect memory. Id. at 808. Similarly, while it is claimed that one feature of the case may receive emphasis over others, 'this is a danger necessarily inherent in the jury system, and is hardly increased by the fact that a juror takes a note.' Ibid. As to the argument that note taking will distract a

will invariably dominate the jury"; (2) that "jurors are not trained in the art of note taking . . . and thus will take down trivial matters and overlook vital facts"; (3) that "a dishonest juror may falsify his notes"; (4) that "the notes will receive undue attention during deliberations, often resulting in a debate on whose notes are correct"; and (5) that "note taking will distract the jurors from watching the witnesses' behavior or may result in the jurors missing other testimony." Each of these claims rests in speculation rather than on empirical data. In the absence of such data, we are inclined to permit the issue of juror note-taking to be a matter of judicial discretion.

In approving note-taking by jurors in this case, we nonetheless recognize that experience or empirical data may suggest a need to modify or eliminate the procedures now specified in rule 8A. As more information becomes available, it should be used to determine whether results in cases in which notes are taken are somehow impermissibly skewed. Such information would also be essential, for example, in evaluating the desirability of permitting those jurors who wish to do so to take notes as a matter of right in all cases, a practice now in effect in several States,[23] and advocated by the American Bar Association.[24] We add that just as confi-

---

juror, the response is that taking notes concentrates one's attention on the testimony. . . . Falsification by a dishonest juror is . . . equally feasible, be it done by means of a written memo or a spoken word.' Note, 18 U. Pitt. L. Rev. 800, 809 (1957). . . . Finally, those who favor note taking by jurors point out that memory is fallible and that notes are a valuable aid in recollecting evidence [26 F.R.D. 409, 458 (1960)]." A.B.A. Standards for Criminal Justice, Standards Relating to Trial by Jury, Comment to Standard 4.2 (Approved Draft 1968).

[23] See, e.g., Ariz. R. Crim. P. 18.6(d) (1973); Cal. Civ. Proc. Code § 612 (Deering 1973); Cal. Penal Code § 1137 (1971); Colo. R. Civ. P. 47(m) (1970); Idaho R. Civ. P. 47(l) (1975); Idaho Code Ann. § 19-2203 (1979) (criminal trials); Iowa Code Ann. § 813.2, R. Crim. P. 18(7)(e) (West 1980 Supp.); Md. R. Crim. P. 758(b) (1977); Minn. R. Crim. P. 26.03 Subd. 12 (1977); Nev. Rev. Stat. § 175-131 (1967); N.D. Cent. Code § 29-22-043 (1960); Utah R. Civ. P. 47 (m) (1950); Utah Code Ann. § 77-32-2 (1978).

[24] See A.B.A. Standards for Criminal Justice, Standards Relating to Trial by Jury 4.2 (Approved Draft 1968).

dence is placed in a jury's ability to decide fairly a criminal or civil case on the evidence presented at trial, confidence can also be placed in the ability of a jury to take and use notes without losing sight of their obligations and the gravity of their responsibilities.

*Trial rulings.* There was evidence that the Herbitses saw St. Germain on December 22, 1976, in the South Boston District Court. The Herbitses were pressing a criminal complaint against an attorney concerning insurance checks arising out of a fire at 42 Binford Street. St. Germain was a potential witness for the attorney and was expected to testify that he had seen William Herbits at the Binford Street property, and that he (St. Germain) had made some repairs to the building. Herbits, the testimony indicated, claimed he had never seen St. Germain before the date of the hearing.[25]

In his opening statement the prosecutor told the jury that his opening was not evidence; that he anticipated offering evidence concerning the December 22 hearing; and that this evidence was limited to the issue of motive. The defendant moved for a mistrial on the ground that the evidence was not admissible, and that the evidence was "inflammatory because it is making the jury think that all my client is doing is moving around with fellows of bad character." The motion was denied. At the conclusion of the Commonwealth's opening, the judge fully instructed the jury on the limited function of an opening. The defendant took no exception to these instructions.

At trial, evidence of the encounter between William Herbits and the defendant was admitted over St. Germain's objection and exception. St. Germain now claims that the

---

[25] To the extent that the testimony included some statements allegedly made by William Herbits, the judge limited that evidence to "the victim's state of mind toward the defendant." *Commonwealth* v. *Borodine*, 371 Mass. 1, 7, cert. denied, 429 U.S. 1049 (1976), and fully instructed the jury on the limited purpose for which they might consider the evidence, both at the time it was admitted and in his final instructions. There was no error in the admission of this testimony.

judge abused his discretion both by permitting the prosecutor to mention this evidence in his opening and by admitting the evidence at trial. The probative value of this evidence is said to have been outweighed by the fact that the evidence was prejudicial, collateral to the main issue at trial and too time consuming. The defendant also claims that since motive was not "clearly shown" from the testimony, it should not have been admitted. We disagree.

"[I]f there is evidence of motive, that evidence is admissible." *Commonwealth* v. *Borodine*, 371 Mass. 1, 8, cert. denied, 429 U.S. 1049 (1976). Determination of the weight of such evidence is for the jury, and evidence which merely suggests rather than "clearly shows" a motive for the crime may still be ruled admissible. There is no requirement that evidence be conclusive in order to be admissible. As is the case with any evidence, resolution of the question whether evidence of motive is more probative than prejudicial lies within the sound discretion of the trial judge. We find no error in the admission of this evidence.

Since evidence of the December 22 hearing was properly admitted, there was no error in denying the defendant's motion for mistrial based on the prosecutor's mention of the evidence in his opening statements.[26] "'As a general rule, counsel is free to state in his opening anything that he expects to be able to prove by evidence.' *Commonwealth* v. *Clark*, 292 Mass. 409 at 410 [1935]. It sometimes happens that witnesses, either from lack of memory or otherwise, do not fulfill the expectations of counsel. [Absent an] indication . . . that the statements in the opening were made in bad faith . . . it will not be presumed." *Commonwealth* v. *Hartford*, 346 Mass. 482, 486 (1963). See *Commonwealth* v. *Fazio*, 375 Mass. 451, 454-455 (1978). *Commonwealth* v. *Martin*, 372 Mass. 412 (1977). There is no basis in the record which suggests bad faith on the part of the prosecutor, and the defendant does not so argue.

---

[26] We do not suggest that a mistrial would have been required had the evidence not been admitted.

*Relief pursuant to G. L. c. 278, § 33E.* St. Germain grounds his request for relief pursuant to G. L. c. 278, § 33E, on the disclosure at trial of LaMier's tape recorded interview. The defendant's arguments, however, "do no more than repeat the arguments which we have already addressed." *Commonwealth* v. *Haywood,* 377 Mass. 755, 771 (1979).

We have reviewed the entire case for consideration of the law and the evidence. We find no reason to order a new trial or to direct the entry of verdicts of a lesser degree of guilt.

*Judgments affirmed.*