Commonwealth vs. Irvin Harris Gilbert.

Hampden. March 6, 1979. — April 24, 1979.

Present: Hennessey, C.J., Quirico, Kaplan, Wilkins, & Abrams, JJ.

*Homicide. Practice, Criminal*, Discovery, Disclosure of statements by witnesses.

Although the prosecutor in a criminal case improperly failed to disclose to defense counsel that a witness, whose written statement had been furnished to defense counsel, had informed the prosecutor on the day before he took the stand that the statement was incorrect in material respects, the defendant was not entitled to dismissal of the indictments or to a new trial where the defendant was not prejudiced by the prosecutor's lapse. [892-896]

Indictments found and returned in the Superior Court on April 15, 1977.

The cases were tried before *Tisdale*, J., and motions for a new trial were heard by him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John F. Donahue* for the defendant.

*John C. Bryson, Jr.*, Assistant District Attorney, for the Commonwealth.

Kaplan, J. In the present case the prosecutor, under a court order following *Lewinski* guidelines,[1] furnished defense counsel before trial with the statement of a prospective Commonwealth witness, reduced to writing. The day before taking the stand, this witness informed the prosecutor that the statement was incorrect in material respects. It could, then, be expected that his testimony

---

[1] *Commonwealth* v. *Lewinski*, 367 Mass. 889, 900-903 (1975), discussed below.

would be more incriminating of the defendant than the prior statement. The prosecutor did not inform defense counsel of this development. At trial, sometime after the witness had completed his testimony on direct and cross-examination, the defense moved to dismiss or for a mistrial because of an alleged breach of duty by the prosecutor. The motions were denied, and the jury finally brought in verdicts on which judgments were entered convicting the defendant of murder in the second degree of one person and involuntary manslaughter of another. Postconviction motions for a new trial, based on the same alleged breach, were denied. On appeal pursuant to G. L. c. 278, §§ 33A-33G, we affirm the judgments of conviction and the orders denying the new trial. We hold that the prosecutor should have made disclosure to defense counsel, but in all the circumstances the defendant was not prejudiced by the omission. It will be useful in considering the matter to get an idea of the facts as they emerged at trial.

About 11 P.M., Saturday, April 9, 1977, the defendant Irvin Harris Gilbert, known as "China Boy," appeared at 457 Central Street, Springfield. A crap game was in progress in a room on the first floor with as many as eighteen men participating or watching. This was the location currently used for a "floating" crap game long established in Springfield. Sitting at the table (a regulation pool table fitted at one end with a backboard faced with foam rubber) was Clarence Edward ("Holyoke") Jones, the "cutman" who ran the game and took a cut of $1 from each center bet. Kenneth Woods was acting as doorman or lookout.

The defendant stayed at the game until about 1 A.M., when he went to a restaurant, returning to the game about 2 or 2:15 A.M. He was in the shooter's box for a time. About 2:30 A.M. Charles Logan was shooting. The defendant testified at trial that he covered a $50 center bet against Logan and also made a $5 side bet against him, putting down a $20 bill. Logan made his point and raked

in the center bet (here Jones would receive his cut) and the $20 bill. The defendant protested that he was owed $15 change, but Logan said he owed nothing and would not give any change. A loud dispute arose. Jones offered the defendant a $10 bill to quiet the affair but the defendant refused it.

At this point the defendant left the house. He returned to the game some ten to fifteen minutes later and renewed the dispute with Logan. There was testimony that he said he was giving Logan one more chance (the defendant testified he might have said that), and further testimony (which the defendant denied) that he took the dice from the table and said the game would not go on unless he got the change from Logan. Logan again refused to pay. There was conflicting testimony as to whether Logan made any move around the table in the defendant's direction. The defendant drew a pistol from his pocket and shot seven rounds. One bullet lodged behind Logan's left ear, another in his upper back. A third bullet struck Jones above his left ear. There was a scramble among those present to get out of the house. The defendant left without hindrance through the front door. Jones died before arrival of an ambulance. Logan died some hours later on the operating table.

The defendant departed for New York shortly after the shooting, disposing of his pistol (which he said he had carried habitually and was carrying on the fatal day) by taking it apart and discarding the parts. Some days later, in the company of counsel, he surrendered to the Springfield police.

Indictments were returned against the defendant on April 15, 1977, for the murders of Logan and Jones. On May 31, a judge of the Superior Court granted the defendant's motion for the disclosure by the Commonwealth of statements of Commonwealth witnesses "[w]ritten or oral reduced to writing under guidelines of Lewinski case." Accordingly the prosecutor made available statements taken from witnesses shortly after the homicides and put in writing by the police.

The case came on to be tried to a Springfield jury on January 10, 1978, and ended on January 21 after seven trial days and a lengthy transcript. Witnesses called by the prosecution were Alexander Thomas, Kenneth Woods, James Baker, John W. King, and James ("Snake") Ellis, all present at the game that night, and, in addition, the medical examiner, a ballistician, a chemist, and police officers. On the defendant's part, there was testimony from a police officer and the defendant. The defense tried to show that the defendant fired the weapon defensively as the victim Logan advanced toward him: counsel suggested that, as to Logan, a verdict of voluntary manslaughter might be apt on a theory of excessive force used in self-defense, or at most a verdict of murder in the second degree, as there was no substantial proof of deliberate premeditation; as to Jones, counsel pointed out that the defendant had no quarrel with him, so a verdict of no more than involuntary manslaughter might be warranted on a hypothesis of reckless discharge of the pistol.[2] But the defense had hard going, as there was no firm evidence that either Logan or Jones was carrying a weapon, and neither had shown any; the defendant had had a space of time to cool off; the notion that Logan was the aggressor encountered the difficulty that he was struck in the back; there was testimony of two volleys with a pause between, suggesting that the second volley was directed intentionally at Jones; if indeed the defendant felt threatened by Logan, he had a line of retreat in the same path he actually took after the homicides; the defendant's fleeing to New York and destroying his weapon were perhaps suggestive of a deeper guilt than he professed. Notwith-

---

[2] In fact the judge did not instruct, nor did the Commonwealth seek an instruction, that even if the defendant lacked an intention to harm Jones, but killed Jones by mistake or negligence in the course of murdering Logan, he might, on a theory of so called "transferred intent," be found guilty of the murder of Jones in the same degree as applied to Logan. See W. R. LaFave & A. W. Scott, Jr., Criminal Law § 35, at 252-255 (1972).

standing these difficulties (among others), the defense made progress by vigorous, extended cross-examination of the witnesses who had been on the scene, showing up contradictions in their stories and confusion about the locations in the room of the principal figures in the criminal event. The judge instructed the jury on murder in both degrees and voluntary and involuntary manslaughter. In the end, the jury returned a verdict of murder in the second degree on the indictment for the murder of Logan, and a verdict of involuntary manslaughter on the indictment for the murder of Jones.[3]

As already indicated, on this appeal the only point argued relates to a witness statement. It was that given by the doorman Woods to the police.

Woods testified as a Commonwealth witness on the second day of trial, January 11. On direct examination he said he was present at the original argument between the defendant and Logan, which he described in substance as it is recounted above. He opened the house door to readmit the defendant and saw and heard the defendant's insistence that Logan make good the $15. The defendant picked up the dice and said (addressing Jones) if he wanted the game to go on, he should tell Logan to give the defendant his money; Jones said he had offered the defendant money, the defendant was always trying to break up the game. Woods turned and started toward the kitchen. He thought Logan used vile language, but Logan wasn't moving at the defendant. At the door of the kitchen, Woods looked around. The defendant had a gun in his hand; someone had knocked the defendant's gun hand in the air; there was a shot. Woods jumped into the kitchen. He heard three shots, then three more shots, but he did not see the firing. Later Woods went to the second floor to call the police.

---

[3] Besides the mandatory life sentence on the murder conviction, the judge sentenced the defendant to a concurrent term of twelve to eighteen years for the manslaughter.

When Woods was taken in cross-examination on the following day, January 12, not only was his direct testimony attacked in detail, but it was brought out at length that that testimony was substantially different from the statement he had given Captain James F. Williams and Lieutenant Ernest Stelzer at 6:35 A.M. on April 10, 1977, within a few hours of the shooting, as recorded by them in twenty-four lines of typing. In that statement Woods said he had been present at the first argument and the commencement of the second but had then gone to the second floor "for something," and while there had heard several shots. He went downstairs and saw the defendant leave with a gun in his hand. He went upstairs to call the police.

Woods's explanation for the differences between the statement and his testimony was that the former was a "misprint"; but it is not hard to see at work Woods's reluctance on the morning to tell a full damning story against a gambling acquaintance. The examiner went on to ask whether Woods had ever sought to correct the "misprint." Woods said he told the assistant district attorney about it the day before he took the stand. It appeared from later redirect examination of Woods that the assistant district attorney on hearing the new story simply told Woods to tell the truth in court. He did not inform defense counsel of Woods's change of stance.

Examination of Woods was completed on January 13. It appears that the motions to dismiss or for a mistrial were made on January 16.

We think the prosecution was at fault in failing to communicate promptly to the defense the changes in Woods's story, of which the defense otherwise became aware only on hearing Woods's testimony on direct examination. It is true that the *Lewinski* case, under which the court made its order for pretrial discovery of witnesses' statements, in terms refers only to statements reduced to writing or put in other tangible form;[4] nor did

[4] "Written statements for this purpose [disclosure] include any statement made by the witness and in some definite way approved by

we have occasion to speak in *Lewinski* about a continuing
duty to disclose. Woods's statement to the assistant dis-
trict attorney was not put in writing and so was not with-
in the terms of *Lewinski*, and it was given after the Com-
monwealth had already once complied with *Lewinski* by
disclosing the previous written statement. But it was,
after all, a matter of choice on the attorney's part wheth-
er he would reduce to writing the statement made to him,
and in the circumstances we think the question of the
attorney's duty should not be made to turn on his own
election. That the attorney's duty should not stop with his
first compliance with the court's order when in fact he
receives later statements of the type covered by the order,
seems also clear. We deal here with discovery which is to
inform the opposing party, minimize surprise, and allow
preparation for the exigencies of trial. The prosecution,
and the defense when in like position, should not subvert
these purposes by leaving in the hands of the adversary,
without due notice or amendment, a document known to
be in effect largely superseded and thus furnishing a poor
lead to the substance of the testimony that will be elicited
from the witness at trial. Rule 14 of the Massachusetts
Rules of Criminal Procedure, to go into effect July 1,
1979, adapting and codifying *Lewinski,* imposes explicitly
a "Continuing Duty" of disclosure applying as well dur-
ing as before trial, see rule 14(a)(4),[5] and while this may

---

him, a transcript of a contemporaneous verbatim or substantially
verbatim stenographic or other recording of an oral statement by the
witness, and a written report consisting of a statement by the wit-
ness." 367 Mass. at 902.

[5] Rule 14(a)(4) reads: "*Continuing Duty.* If either party subsequently
learns of additional material which he would have been under a duty
to disclose or produce pursuant to any provisions of this rule at the
time of a previous discovery order, he shall promptly notify the other
party of his acquisition of such additional material and shall disclose
the material in the same manner as required for initial discovery
under this rule."

Sanctions appear at rule 14(c)(1)-(2).

be read by reference to (a)(2) to point to written statements, we think its penumbral effect in the circumstances of the present case would be to require notification to the defense of the changes in Woods's story. Under the similar prescription of a continuing duty in Fed. R. Crim. P. 16(c) (formerly appearing in substance in rule 16[g]), we think the courts would reach that result. See *United States* v. *Lewis*, 511 F.2d 798 (D.C. Cir. 1975);[6] *United States* v. *Crow Dog*, 532 F.2d 1182, 1188-1189 (8th Cir. 1976), cert. denied, 430 U.S. 929 (1977).

Of course, all this is subject to a rule of reason. It is not shifts of detail on the part of a prospective witness happening to come to the attention of counsel that must be reported to opposing counsel. Here, however, we have changes of substance which in themselves were damaging to the defense.

Concluding that the prosecutor should have made the disclosure, we nevertheless hold, in view of the entire background of the case, that there was no abuse of discretion in the implicit finding of the trial judge that the defendant was not prejudiced by the prosecutor's lapse (see *United States* v. *Joyner*, 494 F.2d 501, 507 [5th Cir.], cert. denied, 419 U.S. 995 [1974]), and, accordingly, the denial of a sanction of dismissal, mistrial, or new trial should not be disturbed.

At the argument on the new trial motion (at which no evidence was offered), the defense suggested, and it repeats in its brief, that had it been informed of Woods's altered, and more incriminating story,[7] it would have tried to "plea bargain" more aggressively, with the possible result that the district attorney would have recom-

---

[6] In this case Judge Lumbard notes that the power of the court to order disclosure in appropriate cases is not confined to the materials mentioned in the bare text of Fed. R. Crim. P. 16. See 511 F.2d at 803 n.8.

[7] As the new story was incriminating rather than exculpatory, the requirements of disclosure laid down in *Brady* v. *Maryland*, 373 U.S. 83 (1963), are inapplicable.

mended, and the court accepted, a plea of manslaughter as to the Logan homicide with some corresponding plea regarding Jones. But the assistant district attorney, answering the argument, stated without challenge that the Commonwealth had held out against any such plea from the outset and had determined to go to trial on the indictments. As Woods's "corrected" testimony was stronger for the prosecution than the testimony envisaged by the written statement, the prosecutor's attitude toward a plea bargain might be expected to harden rather than the opposite. Of course the defense was not stopped from negotiating with the Commonwealth after Woods gave his testimony. As far as appears there was no attempt at discussion. The result of discussion, had it taken place, would in all events have been highly speculative.

Was the defense materially hurt in its preparation by having to meet unexpected testimony by Woods? The defense would stress the importance of Woods's contribution to the Commonwealth's case, thus implying that any added difficulty in preparing for Woods's appearance on the stand would be peculiarly damaging. But the defense does not demonstrate this circumstantially. See *Holt* v. *United States*, 272 F.2d 272, 277 (9th Cir. 1959). Evaluating the entire transcript, of which we have given an outline, we think there was a strong case against the defendant without Woods's added material. As to the problem of preparation, the cross-examination of Woods was not only extended but searching, and we do not think it would have been materially improved by earlier warning about the witness's departure from the written statement.[8] Counsel was quite effective both in getting the witness to acknowledge those differences, and in showing up the weakness of his "misprint" explanation. It is suggestive

---

[8] A claim of prejudice is perhaps more easily sustained where the new material comes in, not on direct examination where it can be met with cross-examination, but by way of impeachment, as in *United States* v. *Lewis*, 511 F.2d 798 (D.C. Cir. 1975). See *United States* v. *Flecha*, 442 F. Supp. 1044, 1046 (E.D. Pa. 1977).

that the defense did not seek a continuance after Woods's direct examination. See *United States* v. *Johnson,* 562 F.2d 515, 518 (8th Cir. 1977); *United States* v. *Crow Dog, supra* at 1188-1189; *Holt* v. *United States, supra* at 278.

The defendant may count himself relatively fortunate in suffering convictions for less than first degree murder. The prosecutor's error of judgment[9] did not have such consequences as would justify opening the convictions.

We have examined the record pursuant to G. L. c. 278, § 33E, and find no basis for mitigating punishment or for other relief in respect to the conviction of murder in the second degree.

*Judgments of conviction and orders*
*denying new trial affirmed.*

---

[9] We add that this is not shown to be a case where the prosecution withheld material in bad faith; rather we take the lapse to have been inadvertent or careless. See *United States* v. *Baum,* 482 F.2d 1325, 1332 (2d Cir. 1973); *United States* v. *Flecha, supra* at 1047 n.5. As was said in *Pierce* v. *United States,* 414 F.2d 163, 169 (5th Cir.), cert. denied, 396 U.S. 960 (1969), "information may not be withheld with the notion that this can be done with impunity if the evidence is ultimately found not to be helpful to the defense."