COMMONWEALTH vs. WALTER J. BALDWIN.

Suffolk. October 6, 1981. — February 1, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.

*Practice, Criminal,* Discovery. *Evidence,* Cross-examination, Arrest record. *Homicide.*

At the trial of indictments for murder, the judge did not abuse his discretion in denying the defendant's motion for a mistrial or a dismissal on the ground that he had been prejudicially surprised by testimony of a principal government witness which varied from a written summary furnished to defense counsel before trial, where the heart of the witness's testimony, including the defendant's admissions of guilt, had been disclosed to defense counsel and was unaffected by any discrepancies and where, although certain variances were significant and were exculpatory in a broad sense, the defendant was not prejudiced by the late disclosures, his counsel made effective use of the discrepancies on cross-examination of the witness, and the defense did not seek a continuance to permit further investigation. [168-178]
Where a prosecutor, during cross-examination of a criminal defendant, attempted to "refresh his recollection" by showing him the record of his arrest on an earlier charge which did not eventuate in a conviction, his tactic, employed at a time when the defendant's memory was clearly not exhausted, was technically improper, but was not prejudicial to the defendant as the prosecutor did not attempt to impeach the defendant by use of the record or to enter it in evidence. [178-179]
It lay within the discretion of the judge at a criminal trial to allow repeated questions on cross-examination of a defendant following his initial denial of possession of a gun, where the matter had been first put in issue by the defendant. [179]

INDICTMENT found and returned in the Superior Court Department on May 14, 1979.

The case was tried before *Dimond, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*William P. Homans, Jr.* (*Anne E. Braudy* with him) for the defendant.

*Kevin Connelly*, Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant was convicted by a jury on November 21, 1979, of murder in the second degree for fatally shooting Kenneth J. Tierney outside a South Boston tavern. The shooting occurred shortly after midnight, on the morning of Sunday, April 11, 1976. The defendant was sentenced to a term of life imprisonment and filed a notice of appeal. G. L. c. 278, § 33E.[1] We transferred the case to this court on our own motion.

Baldwin's primary claim of error on appeal is that the judge improperly denied his motion for a mistrial or dismissal. The motion was made after it became apparent that the testimony of an important prosecution witness varied, at several points, from a written summary made by a police officer of a statement made by the witness several months prior to trial. This summary had been disclosed to defense counsel prior to trial; the discrepancies allegedly first came to defense counsel's attention only when the witness was on the stand. The second claim of error arises from the cross-examination of the defendant. The defendant argues that the judge committed error by allowing the prosecutor to use a record of an arrest, which did not result in conviction, in an attempt to impeach the defendant. We affirm the conviction. We also conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to otherwise mitigate punishment.

The direct evidence against the defendant consisted primarily of the testimony of two witnesses, John P. Shaheen and Clifford J. Sutton. It is on their testimony that we focus most of our attention.

---

[1] The offense for which the defendant was convicted was committed prior to July 1, 1979. *Commonwealth* v. *Davis*, 380 Mass. 1, 13, 16-17 (1980).

*Testimony of John P. Shaheen.* Shaheen testified that on the evening of April 10, 1976, he was working as a "bouncer" and part-time bartender at Barney Grogan's Cafe, a South Boston establishment.[2] While seated at a table with a friend, he saw the defendant, with whom he was acquainted, sitting at the bar with his wife and another couple. Approximately twenty people were in the café at that time. Between 11:30 P.M. and 12:30 A.M., the victim, Kenneth Tierney, entered the café and walked to the end of the bar. Shortly thereafter, the defendant left his place at the bar and approached Shaheen's table. Referring to Tierney, he said to Shaheen, "See that guy there? I'm going to waste him. That's the sucker that set me up."[3] When Shaheen scoffed at this, the defendant, who was standing, leaned over the table, opened his sports coat, and drew a handgun from the waistband of his trousers. He showed the gun to Shaheen. Shaheen was unalarmed at this demonstration by the defendant, although he knew Baldwin had been drinking for four or five hours. He watched as Baldwin put the gun back in his waistband and approached Tierney, who was still standing at the end of the bar. The two men conversed for approximately thirty seconds, but Shaheen was unable to overhear them.

At about this time, Donna Baldwin, the defendant's wife, left the bar area and went to the lavatory. Tierney turned and walked casually past Shaheen toward the main door of the café, followed closely by Baldwin. Shaheen's table was five or six feet from the door. He watched as Tierney pushed open the door and left the café. The door had almost closed when Baldwin pushed it open with his left hand while at the same time reaching with his other hand to his waistband. Baldwin went through the doorway, and the door closed behind him. A few seconds later Shaheen

---

[2] The testimony given by two other employees of the cafe, Katherine Rae and Harold Ploof, cast doubt on whether Shaheen was employed there.

[3] There was evidence that the defendant and his brother Daniel Baldwin had been shot while in a different South Boston bar in April, 1975.

heard "a pop like a firecracker" sounding outside the bar. When he opened the door a few seconds after this, he found Tierney's apparently lifeless body on the ground directly in front of him. Baldwin was nowhere in sight.

Shaheen told everyone present to leave. He opened the door and told Harold Ploof, another employee, who was standing in the doorway, to take over, whereupon he turned to leave. At this point he heard Katherine Rae, who was standing behind the bar, exclaim that "That son of a bitch just shot my best friend's brother." Shaheen went into the café to get his friend out and went home.[4] Shaheen did not inform the police of what he had seen and never discussed the incident with a law enforcement official until August or September of 1977, when he was under an indictment, and then met with representatives of the district attorney's office.[5]

Tierney died on May 5, 1976, three weeks after the shooting. A ballistics examination revealed that the fatal bullet could have been fired from a number of different .32 caliber pistols. The murder weapon has never been recovered.

*Testimony of Clifford J. Sutton.* Clifford Sutton, the defendant's uncle, was the other key prosecution witness. His testimony, especially as it diverged from the account prepared by a police detective of his pretrial statement, is the focus of the present appeal. We treat the police report first.[6]

On May 1, 1979, Detective Sergeant Robert G. Hudson, who was assigned to the office of the district attorney for

---

[4] Ploof did not recall either seeing or talking to Shaheen that night. Rae, who was in a "state of shock" upon receipt of the news of the shooting, testified to making an exclamation similar to the one attributed to her by Shaheen.

[5] Shaheen testified that, at the time of trial, he was a participant in the Federal Witness Program. He had been given a new identity and was residing outside the Boston area. In addition he was receiving $230 a week as "monetary inducement" to testify. Cross-examination of Shaheen revealed his long criminal record, that he had testified for the Commonwealth in several other cases and had received relatively lenient sentences on some recent indictments.

[6] At trial, the report was marked for identification purposes only, and was not introduced in evidence.

Suffolk County as an investigator, met with Sutton at a motel in Hershey, Pennsylvania. During the ensuing conversation, which lasted for about one hour, Hudson jotted down some notes and later made a summary of the conversation, which was reduced to typewritten form. Hudson showed the handwritten notes to Sutton, who told him they were basically correct, although Sutton testified later that the notes were "a little hard to read." Sutton did not see the typed report until about a week before he testified. At that time he mentioned to Hudson that the report was inaccurate in several respects.

The pertinent details of the Hudson report are as follows: In November, 1975, the defendant and his family made a weekend visit to the Sutton home at 303 Wall Street, Hummelstown, Pennsylvania. At this time, Sutton owned many firearms, including a .32 caliber Harrington & Richards revolver, all of which he kept on the premises. Some time after December 21, 1975, the date of a fire in his home, Sutton made an inventory of his firearms. The box for the .32 caliber revolver was in its usual place, but the weapon was gone. Later, possibly in January, 1976, he reported the gun as missing or stolen to the Pennsylvania State police, the county sheriff's department, and the local police. The gun had disappeared some time between November, 1975, and the date of the fire.

On the morning of April 18, 1976 (Easter Sunday), the defendant called Sutton at his new home at 27 South John Street in Hummelstown. The defendant asked permission to visit for a while. He told Sutton that he could be in Hummelstown later that same evening. He arrived at about 9:30 P.M. accompanied by three friends who returned to Boston shortly thereafter. About ten days later, Baldwin's wife joined him at the Sutton home. After another week, Baldwin informed Sutton that he had to return to Boston for a court case arising from a shooting. Baldwin left Pennsylvania in the middle of the week, and the following Saturday his mother called Sutton to tell him that Baldwin was in Boston City Hospital recovering from gunshot wounds.

After Baldwin had recuperated sufficiently, Sutton brought him back to his home in Pennsylvania. Baldwin stayed with the Suttons until June or July of 1976, when he moved to an apartment in nearby Hershey. Baldwin and Sutton formed a contracting partnership, which fell apart in a dispute over work habits.

Some time in October, 1976, Baldwin's father and brother Daniel came to Sutton's home for the weekend. At some point during this time Sutton remarked negatively on the defendant's behavior. According to Hudson's report, Daniel Baldwin responded, "My brother will blow you away like he did Tierney, the Councilman's brother, with your gun that he had stolen."

In the fall of 1977, the defendant and Sutton made efforts at reconciliation. The defendant and his wife visited the Suttons, and Sutton informed the defendant of what his brother Daniel had said earlier. The defendant admitted that he shot Tierney with a .32 caliber revolver stolen from Sutton and provided details of the events surrounding the shooting. He told Sutton that Tierney was responsible for his getting shot "the first time."[7]

The report concluded that Sutton was fearful of his safety if the fact of his cooperation were to be known. He was willing to testify against Baldwin, but only if he were guaranteed protection.

The Commonwealth disclosed information required under the rule enunciated in *Commonwealth* v. *Lewinski*, 367 Mass. 889 (1975), but secured a protective order covering the Hudson report and the identity of the witness. By the terms of the order, that information was to be made available to defense counsel only, and no earlier than four days prior to trial. The document was released to defense counsel on November 1, 1979. At a subsequent hearing, defense counsel was given permission to disclose the contents of the report to Baldwin at such time as the Suttons

---

[7] This was in apparent reference to the incident of April, 1975. See note 3, *supra*.

were in Massachusetts under police protection. Sutton arrived here on November 7, a Wednesday. Defense counsel requested and was granted a one-day continuance to discuss the report with the defendant. The trial began on Friday, November 9. Sutton testified on the following Friday, November 16.

Sutton's testimony was not wholly in accord with his statement as reflected in Hudson's report. Sutton testified that the first visit of the Baldwin family to Pennsylvania took place not in November, but in October, 1975. At this time he was not living at 303 Wall Street in Hummelstown, but in a mobile home near town.[8]

Sutton's testimony, as it concerned the missing .32 caliber pistol, was somewhat confusing. He stated that while he had been living in the mobile home his handguns were kept in a glass display case in his bedroom closet. He had last used the .32 caliber pistol in the fall of 1974, and had had no occasion to use any of the handguns between October, 1975, and July, 1976. He was asked on direct examination whether he inspected the gun case between October, 1975, and July, 1976. He answered that he did so in July, 1976. When asked whether he had made any inspections prior to July, he responded that "I didn't pay it much mind."

During his July, 1976, inspection he found that the locked cover of the case had been pushed in and the box for the .32 caliber pistol was empty. After first inquiring of various family members concerning the gun, he notified the authorities. On cross-examination, however, Sutton affirmed that portion of the Hudson report in which he had stated that the discovery of the missing gun and the report to the police occurred in December, 1975, and January, 1976, respectively.

Sutton explained the apparent variance as to the time he reported the loss of the gun by the fact that what he had done in July, 1976, was to make a "positive report" of theft to the police. In January, 1976, upon first discovering the

---

[8] Sutton attributed the Wall Street address in the police report to a mistake by Hudson.

gun missing, he said he called the Derry township police and made a report to the officer who responded. This report was not "officially filed," since the police had taken and held it pending inquiry within his family. Between this time and July, 1976, he did not pay much attention to the matter because, in his words, he "had more pressing matters" in his life. After the weapon did not turn up in the possession of any family member, he made an "official" report to the Pennsylvania Department of Tobacco and Firearms, the county sheriff's department, and the State police on July 12, 1976. Sutton was unsure whether he had told Hudson of the "official" July report. None of the reports Sutton claimed to have made was offered in evidence.

In his direct examination, Sutton claimed that the next time he saw Baldwin after the family visit in October, 1975, was the evening of Palm Sunday, April 11, 1976, the day Tierney was shot. He admitted on cross-examination that he had earlier given Hudson a date for this visit of Easter Sunday, which was April 18. He testified that after discussing the matter with his wife he was able to set the date correctly by reference to some other events that had occurred around the time of Baldwin's visit. The rest of his testimony regarding Baldwin's April visit did not vary significantly from the version in the Hudson report.

On the stand, Sutton claimed to have had the discussion with Daniel Baldwin and the defendant's father in October, 1977, not in 1976, as was indicated in the Hudson report. Under cross-examination, Sutton contended that the discrepancy was due to an error on Hudson's part. Sutton's testimony concerning both Daniel Baldwin's outburst and the defendant's subsequent admission of guilt in November, 1977, matched what Hudson had recorded. Hudson was recalled by defense counsel. Testifying at first from memory, Hudson recalled that Sutton told him he noticed his revolver missing some time after the first Baldwin family visit. Hudson set the confrontation with Daniel Baldwin as possibly occurring in 1977 and recalled the details he was given of the threat by Daniel Baldwin and of the defendant's admission.

At the close of Sutton's testimony, the defendant moved for mistrial, or, in the alternative, for a dismissal on the ground that he had been prejudicially surprised. *Commonwealth* v. *Gilbert*, 377 Mass. 887 (1979). After a hearing, the judge made specific findings and denied the motion. Having found that the "central fact" of Sutton's testimony, the November, 1977, admission to him by the defendant that he had shot the victim, was in no way affected by the discrepancies alleged, the judge characterized what discrepancies there were between the report and Sutton's trial testimony as variations typical to litigation. He noted further that the statements in the Hudson report were not actually adopted by Sutton and that any variations were essentially as to collateral matters. Finally, he found that the prosecutor had acted in "complete good faith,"[9] that no prejudice had been sustained by the defense, and that there was no breach by the prosecutor of his duty to disclose. We consider the correctness of this ruling.

In this case we again see underscored the reasons for our recent exhortations to prosecuting attorneys to "become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 262 n.10 (1980), quoting from Commentary to ABA Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial, § 2.1(d) (Approved Draft, 1970). See *Commonwealth* v. *Wilson*, 381 Mass. 90, 107 n.37 (1980); *Commonwealth* v. *Lapka*, 13 Mass. App. Ct. 24, 29-31 (1982). If the

---

[9] At the hearing on the motion, the prosecutor represented to the judge that he had not been "fully aware" of the "details" in which the report and the testimony would differ, and that the "information itself was not brought to [his] attention." Were this true, we would expect the prosecutor's opening remarks to reflect the version of events presented in the Hudson report. Instead, the opening, made three days before Sutton testified, tracked Sutton's testimony on direct examination. Cf. *Commonwealth* v. *Delaney*, 11 Mass. App. Ct. 398, 400-402 (1981).

changes in Sutton's expected testimony were "possibly ex-
culpatory," they should have been disclosed.

Sutton was an extremely valuable witness for the Com-
monwealth, although his testimony was certainly not indis-
pensable to the conviction. Contrast *Commonwealth* v. *St.
Germain, supra* at 257 n.3 (without the witness the Com-
monwealth could not have convicted the defendant). De-
fense counsel vigorously cross-examined the other principal
witness, Shaheen, and fully exposed his potential for bias,
but the jury nevertheless had before them his testimony on
the events of the night of the murder. Furthermore, the
heart of Sutton's testimony, Baldwin's admission to him of
his guilt, was fully disclosed to defense counsel prior to trial
and was unaffected by any discrepancies. See *id.* at 264-
265. Together with Shaheen's testimony, this provided a
basis for conviction.

Despite this, we cannot, however, ignore the impact of
the remainder of Sutton's trial testimony. The prosecution,
citing *Commonwealth* v. *Gilbert, supra* at 894, argues that
any variations between Sutton's testimony and Hudson's ac-
count are shifts in detail only and need not have been dis-
closed. The judge found similarly. We disagree.

Although we attach "much importance" to the opinion of
a trial judge on such matters, *Commonwealth* v. *Medina*,
380 Mass. 565, 576 (1980), in our opinion two of the varia-
tions were changes of some significance, of which defense
counsel should have been informed prior to the time the
witness took the stand. With a witness as important as Sut-
ton was to this case, even minor evidentiary discrepancies
can take on great meaning to the defense. See *Common-
wealth* v. *St. Germain, supra* at 262 n.10. Here, Sutton's
testimony on direct examination strengthened, and possibly
created, an inference of consciousness of guilt, with evi-
dence of a rather hasty flight to Pennsylvania the morning
after the shooting. The prosecutor made effective use of
this in his closing argument.

In addition, Sutton's direct testimony revealed a possibili-
ty which also did not exist from a reading of the Hudson re-

port. The fact that Sutton may not have discovered the theft of his .32 caliber pistol until July, 1976, three months after the shooting, suggested that it may not have been stolen until then and countered, however slightly, the inference that this was the weapon used.

Under the broadest definition we have applied, these variances were exculpatory evidence. We have defined such evidence as that "which provides some significant aid to the defendant's case . . . calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978). Because of the importance of Sutton to the Commonwealth's case, and since the standard by which to determine the consequences of delayed disclosure of both inculpatory and exculpatory evidence are not dissimilar, these variations are to be viewed as exculpatory evidence.[10]

The question, when dealing with the delayed disclosure of exculpatory evidence, is "whether, given a timely disclosure, the defense would have been able to prepare and present its case in such a manner as to create a reasonable doubt that would not otherwise have existed." *Commonwealth* v. *Wilson, supra* at 114. Put another way, "it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case.'" *Id.*, quoting from *Commonwealth* v. *Adrey*, 376 Mass. 747, 755 (1978).

---

[10] The distinction between inculpatory and exculpatory evidence is not significant where the issue is delayed disclosure, as opposed to failure to disclose. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 113 (1980). The standards for the application of sanctions for delayed disclosure of the two types of evidence are similar. Compare *Commonwealth* v. *Redding*, 382 Mass. 154, 156 (1980) (no basis to conclude that late disclosure of exculpatory evidence either prejudiced the defendant or created substantial risk of miscarriage of justice), with *Commonwealth* v. *Cundriff*, 382 Mass. 137, 151 (1980) (without a showing of prejudice by late disclosure of inculpatory evidence, new trial cannot be granted).

Making reference to the entire record, we conclude that even the deletion of the evidence in question would not have significantly weakened the Commonwealth's case, anchored as it was on Baldwin's admissions to Shaheen and Sutton. See *Commonwealth* v. *Gilbert, supra* at 895. Framing the discussion in terms of the findings of the judge, we conclude that he did not abuse his discretion in declining to apply the sanctions of mistrial or dismissal. *Commonwealth* v. *Gilbert, supra* at 894. The defendant was not prejudiced by the delayed disclosures. *Commonwealth* v. *Spann*, 383 Mass. 142, 149 (1981). *Commonwealth* v. *Redding*, 382 Mass. 154, 156 (1980). *Commonwealth* v. *Cundriff*, 382 Mass. 137, 150-151 (1980). *Commonwealth* v. *Wilson, supra* at 115. *Commonwealth* v. *Gilbert, supra.* Defense counsel carried out a thorough and searching cross-examination of the witness. He was quite effective in highlighting the discrepancies, to the point of recalling Hudson for that express purpose. See *Commonwealth* v. *Wilson, supra* at 114; *Commonwealth* v. *Gilbert, supra* at 895; *Commonwealth* v. *Adrey, supra* at 755.

Finally, we note that defense counsel did not seek a continuance after the direct examination of Sutton highlighted the discrepancies.[11] *Commonwealth* v. *Gilbert, supra.* See *Commonwealth* v. *Redding, supra* at 156; *Commonwealth* v. *Cundriff, supra* at 150; *Commonwealth* v. *St. Germain, supra* at 264 n.11. We conclude that unless the undisclosed evidence is either virtually destructive of the defendant's case, see *United States* v. *Lewis*, 511 F.2d 798, 803 (D.C.

---

[11] We have noted the Commonwealth's opening statement to have been consistent with Sutton's direct testimony and not with the Hudson version of Sutton's statement. See note 9, *supra.* Experienced defense counsel knew, we assume, that a prosecutor is required to restrict his opening to evidence which he has "a reasonable basis for believing in good faith" will be "tendered and admitted in evidence." S.J.C. Rule 3:08, PF 11, 382 Mass. 802 (1981). Viewed in this light, the defense counsel was on notice of the potential discrepancies in Sutton's testimony on November 13, 1981, the day of the opening and not on November 16, 1981, the day of Sutton's testimony. This would have been an appropriate time in which to seek clarification from the prosecutor.

Cir. 1975), or is strongly supportive of innocence, see *Commonwealth* v. *Ellison, supra,* defense counsel should, when faced with delayed disclosure situations, seek "additional time for investigative purposes." *Commonwealth* v. *Cundriff, supra* at 150.

We do not overlook the point that repeated here is the situation in *Commonwealth* v. *Gilbert, supra,* where the prosecution was aware of, yet failed to disclose to the defense, possibly significant discrepancies between the expected testimony of a key witness and his actual testimony. Although we do not find it necessary to order a new trial, neither do we wish to signal to prosecutors that "information may . . . be withheld . . . [and] this can be done with impunity if the [nondisclosure] is ultimately found not to be [prejudicial] to the defense." *Commonwealth* v. *Gilbert,* 377 Mass. 887, 896 n.9 (1979). See Mass. R. Crim. P. 14 (a) (4), 378 Mass. 874 (1979).[12] We call attention to the obligation of prosecutors to disclose exculpatory evidence, not only under the case law and Mass. R. Crim. P. 14 (a) (1) and (4), but also pursuant to their ethical obligation under S.J.C. Rule 3:08, PF 7 (a), 382 Mass. 800 (1981) (formerly S.J.C. Rule 3:22A), and S.J.C. Rule 3:07, DR 7-109 (A), 382 Mass. 793 (1981) (formerly S.J.C. Rule 3:22).

We note, in addition, the broad range of sanctions available to trial judges for noncompliance with required discovery. Mass. R. Crim. P. 14 (c), 378 Mass. 874 (1979). Compare 18 U.S.C. § 3500(d) (1976). Under Mass. R. Crim. P. 14 (c) the judge is empowered to exclude the evidence withheld, see Mass. R. Crim. P. 14 (c) (2), or to "enter such other order as he deems best under the circumstances." Mass. R. Crim. P. 14 (c) (1). A trial judge's discretion to find prejudice is much broader than ours, and we note situations where mistrials have been granted for late-disclosed discrepancies which were arguably no more prejudicial than

---

[12] Where the police are aware of the evidence, as was Hudson, this duty is imposed on prosecutors even if they are in fact unaware of it. *Commonwealth* v. *Redding, supra* at 157. *Commonwealth* v. *St. Germain,* 381 Mass. 256, 261 (1980).

those in the case at bar.  Cf. *Commonwealth* v. *Blaikie*, 375 Mass. 601, 606 (1978).

We turn next to the defendant's claim of error during his cross-examination.  During cross-examination the prosecutor asked him whether it was his testimony that he "never had a .32 caliber handgun or any other handgun on the night Kenneth Tierney was shot."  He answered that "I never owned any handgun or rifle in my life."  When he affirmed this answer in response to another question, he was shown, in an attempt to "refresh his recollection" (over the objection of defense counsel), a 1968 South Boston District Court complaint, subsequently dismissed, charging him with unlawfully carrying a .32 caliber pistol.[13]

At a bench conference, defense counsel moved for a mistrial claiming that this was a "second-hand way of putting in a record in which there was no conviction" in violation of G. L. c. 233, § 21.  The prosecutor emphasized that he did not intend to put the arrest record in evidence, and the judge allowed him to continue the line of questioning, but cautioned him to "proceed rather gingerly" and not to display the document to the jury.

When questioning resumed, the defendant was asked if the document refreshed his recollection as to whether he had ever possessed a .32 caliber handgun.  He answered that "I didn't have one in my possession.  There was [*sic*] other people charged with the same gun."  Shortly thereafter, the judge instructed the jury, prior to recessing for the day, that they were not to consider in any way a document not admitted in evidence.

Given the manner in which the record of his arrest was used, we find no merit in the defendant's claim that he was prejudiced.  The prosecutor did not attempt to impeach in violation of G. L. c. 233, § 21 (only records of convictions may be used to impeach), nor did he attempt to enter evi-

---

[13] The Commonwealth admits in its brief the technical impropriety of framing the question in terms of refreshing the defendant's recollection where there was no indication that his memory had been exhausted.

dence of the defendant's prior arrest. See *Commonwealth v. Haywood*, 377 Mass. 755, 758-760 (1979). Indeed, the document was never offered, and its contents were not disclosed to the jury. The form of the prosecutor's questions, couched as they were in terms of refreshing Baldwin's recollection was technically improper. The defendant's memory was clearly not exhausted but was instead different from what his examiner wished it to be. Compare *Commonwealth v. Key*, 381 Mass. 19, 28-29 (1980).

There was, however, no abuse of discretion by the judge in allowing the prosecutor's repeated queries following Baldwin's initial denial of possession of a gun. Despite the formal defects, the question, on a matter put in issue in the first place by the defendant, was within the scope of allowable cross-examination. *Commonwealth v. Key, supra. Commonwealth v. Hicks*, 375 Mass. 274, 278 (1978). *Commonwealth v. Sandler*, 368 Mass. 729, 737-738 (1975).

The judge carefully oversaw the uses to which the document was put during the examination of the defendant and properly instructed the jury later concerning documents not in evidence. There was no prejudice.

Pursuant to our duties under G. L. c. 278, § 33E, we have examined the entire record in view of the fact that the offense was committed prior to July 1, 1979. *Commonwealth v. Davis*, 380 Mass. 1, 13-14, 16-17 (1980). We are satisfied that there was no miscarriage of justice.

*Judgment affirmed.*