## COMMONWEALTH vs. NNAEMEKA ENEH.

No. 09-P-413.

Suffolk. February 4, 2010. - April 27, 2010.

Present: CYPHER, BROWN, & RUBIN, JJ.

*Controlled Substances. Practice, Criminal,* Discovery, Disclosure of evidence. *Entrapment. Evidence,* Certificate of drug analysis.

At the trial of indictments charging trafficking in cocaine and trafficking in heroin, in which the defense proceeded solely on a theory of entrapment (i.e., that the defendant was a homeless, penniless heroin addict who was ultimately induced by a government agent's persistent badgering to provide him with drugs), the admission in evidence of late-disclosed bank records revealing the defendant had $14,000 in a bank account warranted reversal of the defendant's convictions, where the consequences of the delayed disclosure, which impugned the defendant's credibility and went to the heart of the defense theory, hindered the defense from raising a reasonable doubt in the minds of the jurors and may have contributed to the verdicts. [677-682]

INDICTMENT found and returned in the Superior Court Department on January 31, 2006.

The case was tried before *Margaret R. Hinkle,* J.

*Kevin S. Nixon* for the defendant.

*Teresa K. Anderson,* Assistant District Attorney, for the Commonwealth.

CYPHER, J. After trial on a two-count indictment charging trafficking in cocaine and trafficking in heroin, a Superior Court jury convicted the defendant, Nnaemeka Eneh, of trafficking in cocaine and the lesser included offense of possession of heroin with intent to distribute. On appeal, the defendant claims that he was prejudiced by the prosecution's delayed disclosure of bank records. We agree and reverse the defendant's convictions.[1]

---

[1] The defendant also claims prejudice from the introduction in evidence of drug certificates. Because of the result we reach we need not address this claim. But see our discussion in part two, *infra.*

*Factual background.* The indictments were predicated on the sale of cocaine and heroin by the defendant to Drug Enforcement Administration (DEA) Special Agent Patrick Dorsey, and the later discovery of thirteen small packets of heroin hidden on the defendant. At trial, the defendant did not dispute that the sale had taken place, that he had additional heroin on his person, or, indeed, that a second, earlier sale had occurred. Rather, he claimed that he had been entrapped.

Defense counsel set the stage for the defense in his opening statement. He began by asking the jury to consider whether the defendant "would have committed this crime but for the insistence and urging of Special Agent Dorsey." He explained that the defendant had come to the United States in 2001 to pursue his education and later settled in Boston to accomplish this goal. Defense counsel admitted, however, that the defendant "quickly became homeless" due to his burgeoning heroin addiction. While homeless, the defendant met Melissa Wilkin, the woman who was to become the mother of his child. She too had a heroin addiction and was homeless because of her habit. Although the defendant and Wilkin pooled her wages with money they borrowed from family and friends, "they spent most of their time hanging out on the streets of Boston" and "hustling for spare change in the Boston Common and the streets" in order "to placate their addictions."

Defense counsel explained that in May, 2005, the defendant was introduced to DEA Special Agent Dorsey, working undercover, who began to regularly pester him for drugs. In June, 2005, when the defendant became weak from heroin withdrawal, he agreed to get Dorsey heroin because he anticipated being able to skim some "heroin off the top so he could take care of himself and his girlfriend." The defendant consummated the transaction, but Dorsey continued to maintain routine contact with him, repeatedly "prodding" him to get more heroin. The defendant, however, refused. Not until November, 2005, when he was again weak from heroin withdrawal, did he agree to sell more drugs to Dorsey. That sale was interrupted by the defendant's arrest, which resulted in the current charges.

Upon the completion of opening statements, the prosecutor called her first witness, Special Agent Dorsey, and was able to

elicit only some preliminary information before the first day of trial concluded.

The next morning, defense counsel informed the judge that the prosecutor had contacted him the previous evening to disclose the existence of inculpatory bank records. The police had found a bank receipt on the defendant during booking showing that a few days earlier, he had made a cash deposit in the amount of $5,010 into a joint account that he held with Wilkin, bringing the total in the account to more than $14,000. The police copied this receipt and returned the original to the defendant but apparently failed to provide the information to the prosecutor until after the first day of trial had concluded.

Defense counsel moved to exclude the late-disclosed documents, pointing out that he had just "described my client to the jury as a homeless drug addict panhandling in the Boston Common for spare change," only to have a "bomb dropped on me that he has more money in his bank account than I do." When the prosecutor agreed not to use the documents in her case-in-chief, the judge declined to rule on the defendant's motion to exclude the documents and stated that she would address the matter before the defendant or Wilkin testified.

Dorsey resumed the stand and testified that in two brief telephone conversations with the defendant, one on November 16, 2005, and another on November 17, 2005, he arranged to purchase fifteen grams of heroin. The telephone calls were recorded and were played for the jury. At approximately 2:30 P.M. on November 17, as agreed, Dorsey met the defendant at the Sevens restaurant in Boston. The defendant told Dorsey that he had been in a hurry when he picked up the heroin from his supplier and had grabbed two packages, one containing heroin and the other, to the defendant's surprise, containing cocaine, and he therefore did not have the full fifteen grams of heroin Dorsey had requested.

Dorsey agreed to buy both packages, and they went to Dorsey's car. There, the defendant reached into his sock and pulled out two opaque bluish-purple balloon-type packages. Dorsey told the defendant that the money was in the trunk and got out of the vehicle. Dorsey opened the trunk, which was the prearranged signal to the surveillance team that he had the contraband, then closed the trunk and walked away. The surveillance team

moved in, arrested the defendant, and brought him to the police station. During booking, an additional thirteen small packets of heroin were discovered inside a terry cloth headband on the defendant's thigh.

Dorsey later returned to the police station and field tested the drugs in "small containers that come from the lab." The two packages he had obtained from the defendant tested positive for heroin and cocaine. Certificates of analysis were introduced in evidence that confirmed the field test results and showed that the thirteen smaller packets found in the headband contained heroin. The certificates further indicated that the cocaine weighed 14.50 grams, the large package of heroin weighed 10.13 grams, and, collectively, the thirteen smaller packages of heroin weighed 4.22 grams. Special Agent James Doyle, a twenty-year DEA veteran, gave an opinion that the thirteen smaller packets contained heroin packaged for street-level distribution. He also testified that, in 2005, a gram of heroin sold for about $100.

Dorsey was also questioned about an earlier heroin purchase that he had made from the defendant. The defendant was never charged with this sale, and the judge gave a limiting instruction that the evidence could only be used to establish the defendant's predisposition to sell heroin in relation to his claim that he had been entrapped.

Dorsey explained that he had first met the defendant on June 6, 2005, and by June 15, 2005, in a recorded telephone conversation, the defendant had agreed to sell Dorsey five grams of heroin. Two days later, on June 17, 2005, they met at the Sevens restaurant and spent about forty-five minutes in the restaurant, eating, before going to Dorsey's motor vehicle. Inside the car, the defendant handed Dorsey what appeared to be heroin. Dorsey put the package on a scale that he had with him and discovered that it weighed only 3.8 grams, not the agreed-upon five grams. The defendant agreed to take $100 less than the originally established price of $500. Field testing showed the substance tested positive for heroin.

Dorsey further testified that at the end of the June transaction, he told the defendant he would be going to Florida for a while but wanted to know if the defendant could "bump it up" and supply him with ten or fifteen grams of heroin when he

returned. The defendant said that would not be a problem. According to Dorsey, he had no further contact with the defendant until November, 2005, because he was involved in a more important wiretap investigation.

Melissa Wilkin, the defendant's girlfriend, testified for the defense. She testified that the defendant had a three gram a day heroin habit and that she used about two grams of heroin per day. Although she worked close to full time at Dunkin' Donuts and begged for money on the streets of Boston, her heroin habit left her homeless. Wilkin acknowledged that in 2005, she had about $10,000 in a joint bank account she held with the defendant. She said the money came from the defendant's family and her job and that they were saving for a place to live. She testified that she never saw the defendant sell drugs.

During cross-examination, the prosecutor sought to admit the records related to the couple's savings account that had been discovered on the defendant during booking. Defense counsel objected and argued that "[i]f I had known about these documents, even a month ago, my angle of attack most certainly would have been different." The judge overruled the objection, stating that the "fundamental problem with this argument is that nobody . . . has the right to take the witness stand and lie. Not a defendant, not a witness and there's nothing at this point that suggests anything other than that."

The defendant also testified and said that he moved to Boston in 2003 to attend school but that by 2004, he had abandoned this goal because he had acquired a three gram a day heroin habit. In 2005, he, like his girlfriend, was homeless because of his drug habit. In order to fund his habit, he begged, which could net $220 a day, and his family gave him money when he lied and told them he needed it for school.

In April, 2005, he met Dorsey, who was looking for drugs. According to the defendant, Dorsey called him "all the time," and met him three to four times per week looking for drugs. In June, he was sick from withdrawal and finally agreed to sell Dorsey five grams of heroin so that he could take some off the top for himself. He sold the "short" packet to Dorsey in June, because Dorsey had been hounding him to do so and because he was ill. He testified that he had never sold drugs before this date.

The defendant testified that between June and November, Dorsey frequently contacted him looking for drugs. He succumbed to Dorsey's pressure in November, 2005, when withdrawal was again making him ill. Before delivering the heroin packet, he skimmed some off the top and put it in thirteen single dose packets to ensure that neither he nor his girlfriend would overdose. The defendant denied selling drugs to anyone other than Dorsey.

On cross-examination, the defendant testified that the money in the joint account had come from cash that his family had given him and from his girlfriend's wages. He said that he had opened the account because he could not hold money and he and his girlfriend were trying to save money to get married.

*Discussion.* 1. *Delayed disclosure.* The defendant argues that the judge erred in failing to exclude the late-disclosed bank records. He contends that the evidence, revealed for the first time after he had made an opening statement setting out the entrapment theory, eviscerated that defense.

Modern rules of discovery were created to permit defense counsel to learn, through discovery of the government's evidence, what the defendant faces in standing trial, and to assist in preventing trial by ambush. See *United States* v. *Lewis*, 511 F.2d 798, 802 (D.C. Cir. 1975). See also *Commonwealth* v. *Durham*, 446 Mass. 212, 231-244 (2006) (Cordy, J., dissenting). Put differently, the purpose "is to prevent the admission of 'surprise' evidence and the concomitant prejudice often associated with same." *Commonwealth* v. *Figueroa*, 74 Mass. App. Ct. 784, 792 (2009). See *Commonwealth* v. *Green*, 72 Mass. App. Ct. 903, 903-904 (2008) (same); *id.* at 903 n.1, citing Reporters' Notes to Mass.R.Crim.P. 14, Mass. Ann. Laws, Rules of Criminal Procedure, at 1473 (LexisNexis 2007).

Here, there is no dispute that the bank records were relevant to the underlying charge of trafficking and should have been disclosed during discovery.[2] That the police, rather than the prosecutor, were responsible for the delay is of no consequence. See, e.g., *Commonwealth* v. *Kater*, 432 Mass. 404, 418 (2000).

---

[2]The defendant moved for discovery before trial, although a copy of that motion has not been included in the record appendix. In any event, where, as here, the bank records were relevant to show that the defendant was a drug trafficker, as he had no other apparent means by which to acquire such large

It may be tempting to stop at this juncture and brush aside any consideration of relief because the late disclosure relates to the defendant's own bank account. Our system of jurisprudence, however, has made clear that the obligations imposed on the prosecution to ensure that a criminal defendant receives a fair trial do not, and cannot, depend on something as unpredictable as the facts a criminal defendant chooses to disclose to his or her attorney. See, e.g., *United States* v. *Padrone*, 406 F.2d 560, 561 (2d Cir. 1969) (failure by prosecution to turn over statement had profound effect on defense strategy); *Commonwealth* v. *Cundriff*, 382 Mass. 137, 149 (1980), cert. denied, 451 U.S. 973 (1981), citing *United States* v. *Lewis*, 511 F.2d at 800-801 ("trial judge found to have erred by failing to suppress defendant's incriminating statement where government had known about it and had agreed not to use any such statements"). Compare *Commonwealth* v. *Cundriff*, *supra* at 148-151 (court recognized late disclosure claim based on failure to turn over defendant's inculpatory statement but concluded relief was not warranted where defendant was not prejudiced).

In determining the consequences of late disclosure, we ask whether "the defense [was] materially hurt in its preparation by having to meet [the] unexpected [evidence.]" *Commonwealth* v. *Gilbert*, 377 Mass. 887, 895 (1979). Here, where the defense proceeded on a theory of entrapment, designed to create a reasonable doubt in the minds of the jurors, we consider the extent to which that defense was harmed by the late disclosure. Compare *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980) (exculpatory evidence); *Commonwealth* v. *Baldwin*, 385 Mass. 165, 175 n.10 (1982) ("distinction between inculpatory and exculpatory evidence is not significant where the issue is delayed disclosure, as opposed to failure to disclose"). Where, as here, material evidence "is initially suppressed, but then disclosed, it is the consequences of the delay that matter, not the likely impact of

---

amounts of cash, compare *Pena* v. *Commonwealth*, 426 Mass. 1015, 1018 (1998) (defendant's arrest "with a large amount of cash on his person . . . strongly suggests his direct participation in . . . drug distribution"); *Commonwealth* v. *Montalvo*, *ante* 319, 324-325 (2010) (same), the records qualify as "intended exhibits" that must be disclosed by the prosecution in accordance with the mandatory rules pertaining to discovery. See Mass.R.Crim.P. 14(a)(1)(A)(vii), as amended, 444 Mass. 1501 (2005).

the . . . evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case.' " *Commonwealth* v. *Wilson, supra,* quoting from *Commonwealth* v. *Adrey,* 376 Mass. 747, 755 (1978). See *Commonwealth* v. *Baldwin,* 385 Mass. at 175.

Here, as we have noted, the defense, as indicated in the pretrial notice provided to the prosecution, rested solely on the theory that the defendant had been entrapped.[3] Having been forewarned that the defense intended to rely on a theory that amounted to a claim of police misconduct, the prosecution would have been well advised to review the evidence anew with law enforcement. Had this occurred, the overlooked bank records, or their undervalued importance, would surely have surfaced and been disclosed to the defense in advance of trial. See *Commonwealth* v. *Madigan,* 449 Mass. 702, 710 (2007) (upon notice of entrapment defense, prosecution noted anticipated evidence that might show defense was not viable).

In any event, unaware of this evidence, counsel made an opening statement, as planned, in which he told the jury the defense theory was premised on evidence that showed the defendant was a penniless, homeless, heroin addict who was ultimately induced by Dorsey's persistent badgering to provide him with narcotics. The inducement was made easier because in both June and November, 2005, the defendant had begun to experience withdrawal symptoms before agreeing to sell drugs to Dorsey. Additionally, he thought each sale might provide him

---

[3]"There are two elements of the entrapment defense: (1) that the defendant was induced by a government agent or one acting at his direction and (2) that the defendant lacked predisposition to engage in the criminal conduct of which he is accused." *Commonwealth* v. *Madigan,* 449 Mass. 702, 707 (2007), quoting from *Commonwealth* v. *Penta,* 32 Mass. App. Ct. 36, 47 (1992). "The threshold for a defendant to raise the entrapment issue is low . . . ." *Commonwealth* v. *Madigan, supra* at 707-708, quoting from *Commonwealth* v. *Tracey,* 416 Mass. 528, 536 (1993). The defendant can raise the defense "by the introduction of some evidence of inducement by a government agent or one acting at his direction. Mere evidence of solicitation is not enough to show inducement, but little more than solicitation is required to raise the issue. '[A]ny evidence . . . that the government agents went beyond a simple request and pleaded or argued with the defendant, should be enough.' " *Commonwealth* v. *Shuman,* 391 Mass. 345, 351 (1984), quoting from *Kadis* v. *United States,* 373 F.2d 370, 374 (1st Cir. 1967).

with an opportunity to skim some heroin off the top for himself. See *Commonwealth* v. *Shuman*, 391 Mass. 345, 355 (1984), quoting from *United States* v. *Williams*, 705 F.2d 603, 620 (2d Cir.), cert. denied, 464 U.S. 1007 (1983) (remedy may be warranted where evidence depicts government conduct that "involved . . . pressure [or] persistent exploitation of personal weakness, as might occur if an agent preys upon an addict's need for narcotics"). Compare *Commonwealth* v. *Coyne*, 44 Mass. App. Ct. 1, 4 (1997) (evidence did not support an instruction that defendant's addiction rendered him particularly susceptible to government pressure to sell drugs). When it was then revealed that the defendant had $14,000 in a bank account that he held with Wilkin, the entrapment theory was crippled by this "new evidence" that showed the defendant was not penniless and, more significantly, that he did not need to sell drugs to Dorsey to obtain more heroin; he could easily have purchased heroin.

Although the Commonwealth agreed not to introduce the bank records in its case-in-chief, that concession was of little benefit to the defendant in the circumstances of this case. In order to present the entrapment defense, it was virtually guaranteed that the defendant would have to take the stand to outline the frequent and persistent contact Dorsey had with him that wore him down. Moreover, defense counsel had, not surprisingly, promised in the opening statement that the defendant and his girlfriend would take the stand, and reneging on that promise to avoid the introduction of the bank records was not a viable course of action. See generally *Commonwealth* v. *Duran*, 435 Mass. 97, 109 (2001) ("promise . . . in . . . opening statement to produce key testimony, followed by a failure to deliver it may, without more, constitute ineffective assistance of counsel").

Once the defendant's girlfriend testified, the door was open for the prosecution to introduce the bank records; their admission on cross-examination was at least as devastating as if they had been introduced during the Commonwealth's case-in-chief. See *Commonwealth* v. *Gilbert*, 377 Mass. at 895 n.8. Although the defendant was able to offer a belated explanation through his own testimony and that of his girlfriend, claiming that he had gotten the money by lying to his family, telling them he

needed funds for school, that explanation hardly sufficed to offset the damage caused by the contrary presentation of his poverty in the opening statement.[4] The disastrous result of admitting the bank records was to show that the defendant was a liar. In overruling the defendant's objection to admitting the documents, the judge recognized this precise point and used it as a basis for her ruling, stating that "nobody has the right to take the witness stand and lie . . . there's nothing at this point that suggests anything other than that."[5]

Thus, the consequences of the delayed disclosure impugned the defendant's credibility. Had the disclosure been timely made, counsel could have made "effective use of the evidence in preparing and presenting his case" by incorporating the information into the theory of the defense and avoiding an opening statement that impaled that defense. *Commonwealth* v. *Baldwin*, 385 Mass. at 175. See *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. 435, 441-442 (1992), quoting from *Commonwealth* v. *Pizzotti*, 27 Mass. App. Ct. 376, 381 (1989) (this is a case where "we can easily 'see how the defense would have altered [its] tactic[s] if it had been informed earlier' ").

The Commonwealth argues that even if the evidence should have been excluded, the evidence against the defendant was so overwhelming that the error was nonprejudicial. We assume without deciding that a lack of disclosure that affected the preparation and presentation of an individual's defense may nonetheless in some circumstances be nonprejudicial. The defense, however, even hobbled by the bank records, was not without some persuasive effect. For example, even though two separate undercover buys would typically be the death knell of an entrapment defense because the first sale would prove predisposition,

---

[4]Defense counsel also stated in his opening that the defendant and his girlfriend worked "sporadic jobs, nothing to brag about, they would borrow money off friends and family for lots of reasons and they would make a lot of money hustling for spare change in the Boston Common and the streets there around." We do not agree with the Commonwealth's argument that this statement adequately addressed the matter of the $14,000 joint bank account, "albeit in less detail."

[5]Decisional law also suggests that a defendant may be entitled to a continuance in order to address the late disclosure. See generally *Commonwealth* v. *Baldwin*, 385 Mass. at 177. Here, a continuance could not have cured the delay in the disclosure.

defense counsel turned the two transactions to his advantage. He argued in closing that after the June sale, Dorsey's testimony that he had no contact with the defendant for the next five months was not credible. Defense counsel maligned the DEA agent's explanation that he had been pulled off the case to work a more serious investigation, arguing that no officer works one case at a time, leaving a heroin seller wholly free to dispense his wares. Rather, defense counsel argued that Dorsey had relentlessly pressured the defendant from June until November in order to recruit the defendant to sell drugs.

In addition, counsel argued that while the conversation during the actual transaction in June had been recorded, there was no recording made of the November transaction, despite several of the conversations leading up to the November sale having been recorded. Those conversations included Dorsey telling the defendant that he had been calling him "for two days now," and reminding the defendant that he had Dorsey's telephone number. That the defense was somewhat successful is suggested by the more than four hours of deliberations that went past 5:00 P.M. and the defendant's conviction of the lesser included offense on one of the charges.

In the circumstances of this case, we are constrained to conclude that because the delayed disclosure impugned the defendant's credibility and went to the heart of the defense theory, hindering the defense from raising a reasonable doubt in the minds of the jurors, it may have contributed to the verdict. See generally *Commonwealth* v. *Semedo*, 456 Mass. 1, 12 (2010), quoting from *Commonwealth* v. *Grimshaw*, 412 Mass. 505, 508-509 (1992) (error is prejudicial where it "had, or might have had, an effect on the jury and [where] the error contributed or might have contributed to the verdicts"). See also *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. at 442-443, quoting from *Commonwealth* v. *Wilson*, 381 Mass. at 115 (relief warranted where court concluded that, in circumstances presented, delayed disclosure "affected the outcome of the trial").

2. *Certificates of analysis.* Relying on *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527, 2532 (2009), the defendant next argues that the admission of the drug certificates of analysis, without testimony by the analyst who performed the drug tests, violated the confrontation clause of the Sixth Amendment to the

United States Constitution. We need not address this claim given our decision outlined above, but note that at any retrial, we would anticipate that the certificates would not be introduced without the appropriate accompanying testimony.

*Judgments reversed.*

*Verdicts set aside.*